## THE MADISON AND INDIANAPOLIS RAILROAD COMPANY v. THE NORWICH SAVING SOCIETY.

CORPORATIONS.—BONDS.—The *Martinsville & Franklin Railroad Company* issued certain bonds, payable to the order of the *Madison & Indianapolis Railroad Company*, for the purpose of borrowing money to complete the road of the former company. The bonds were delivered to the *Madison Company*, and were indorsed and guaranteed by that company, and sent to its agent at *New York* for sale. The agent, in a circular offering the bonds for sale, represented that they were owned by the *Madison Company*. Suit by the holders of the bonds against the *Madison & Indianapolis Railroad Company* upon its guaranty.

The Madison and Indianapolis R. R. Co. *v.* The Norwich Saving Society.

*Held,* that it is within the corporate powers of the *Madison & Indianapolis Railroad Company* to sell and guarantee bonds held by it in the usual course of its business.

*Held,* also, that as the contract of guaranty upon the bonds was, upon its face, such a contract as the company had power to make, the fact that the guaranty was, in this case, made for a purpose not authorized by the charter, (as for the accommodation of another road,) could not affect the right of a *bona fide* holder, without notice, to recover upon it.

*Held,* also, that the general agent of a corporation, clothed with certain powers by the charter, or the lawful act of the corporation, may use those powers for an unauthorized, or even a prohibited, purpose, in his dealings with an innocent third party, and yet the corporation be held liable for his acts.

APPEAL from the *Marion* Common Pleas.

GREGORY, J.—Suit by the appellee against the appellant, on the guaranty of the latter of the payment of certain bonds executed by the *Martinsville & Franklin Railroad Company,* payable to the *Madison & Indianapolis Railroad Company,* or assigns, at the *Merchants' Bank,* in the city of *New York,* and by the latter railway company assigned to *Winslow, Lanier & Co.* The bonds were put upon the market, in the city of *New York,* by *Winslow, Lanier & Co.,* the agents of the payee, by a circular, in which it was represented that the appellant was the owner of the bonds; that the same had been issued to her by the maker, to pay a certain indebtedness of the latter to the former. The appellee is the holder, in good faith, of the bonds and guaranty sued on.

*William N. Jackson,* on the trial, testified that "he was the secretary of the appellant on the 1st of *May,* 1852; was such secretary from 1844 to 1853. That the appellant had agreed to indorse the bonds of the *Martinsville Company;* that the first order was for $25,000, but was increased to $30,000; that the bonds were for the purpose of preparing the *Martinsville Road* for the iron. The bonds were not issued to, nor indorsed by, the appellant for any indebtedness due from the *Martinsville Company;* there was no such indebtedness; nor in consideration of iron sold by

the *Madison Road* to the *Martinsville Road,* but to give them credit, that the latter might raise money upon them to prepare the road for the iron. The inducement to the *Madison Road* to indorse the bonds was to get business from the *Martinsville Road* when completed; this business was expected by the intersection at *Franklin.* *Winslow, Lanier & Co.,* were stockholders in the *Madison Company,* and one of them was a director in the road; thinks it was *Winslow.* When the bonds were sold, the *Madison Company* was notified, and the money passed through the office of that road, and *Mr. Parks* received it as the president of the *Martinsville Company.* The bonds sold for $85 on the $100. *Parks,* as president of the *Martinsville Company,* borrowed money of the *Madison Company* in advance, which was repaid out of the proceeds of the sale of the bonds. The bonds sold for about $25,000, and the whole proceeds were paid over to *Parks,* part before, and part after the sale of the bonds. No interest was paid to the *Madison Company* on advances. The following advances were made in 1850: $5,000, $3,000, $3,000, $2,500 and $2,000. This was in the months of *May, June, August* and *October,* 1850, and in *January,* 1851. Between that time and *September,* 1853, the *Martinsville Company* received $2,500, $1,000, $1,376, with smaller sums making up the amount of sales of the bonds. Thinks that no stock of the *Martinsville Company* was transferred to the *Madison Company.* He ceased to be secretary of the *Madison Company* about *June* 1st, 1853, and previous to his leaving he thinks no payment in money or bonds was made by the *Martinsville Company* to the *Madison Company,* for iron furnished by the latter to the former. The first shipment that was received upon the *Martinsville Road* was in *December,* 1853, and the iron had been laid in the summer of 1853.

" *S. S. Gillett* was treasurer of the *Madison Road.* The agreement for running the *Martinsville Road* by the *Madison*

*Road* was made after the sale of the bonds, and was in 1853. The records of the appellant are at *Madison.*

"His impression is that *Winslow, Lanier & Co.*, notified the *Madison Company* as the sales of the bonds were made, and said company then paid to the *Martinsville Company* the amount, and sometimes paid in advance. The *Madison Company* transacted its business in *New York* through *Winslow, Lanier & Co.*, and had large business transactions with them. The indorsement of the bonds by the *Madison Company* was printed with the bonds, but the signature of *Mr. Brough* was written, and witness' signature as secretary was written; the date was also written, and the seal was impressed.

"The *Madison Company* was selling its own bonds at *Winslow, Lanier & Co.'s* about the same time; and previous to 1852, they had sold for the *Madison Road*, perhaps, $600,000 of bonds, or perhaps more. In 1852, the *Madison Company* had good credit in *New York.* The *Martinsville Company* was almost unknown in *New York*, and could not have had much credit.

"When he signed the indorsement of the bonds, he handed them to the president or treasurer of the *Madison Company*, but he supposes he handed them to the treasurer, and does not know whether *Mr. Parks* had them or not."

It is contended that the charter of the *Madison Company* did not empower it to make accommodation paper, and that the construction of the *Franklin Road* was a purpose foreign to the objects for which the former company was incorporated, and that therefore the bonds and guaranty were issued without authority by the appellant, and are therefore void, even in the hands of an innocent *bona fide* holder.

The bonds and guaranty were legal on their face. It is within the corporate power of the appellant to sell and guarantee bonds held in the usual course of business. The court below, sitting as a jury, had a right, from the evidence, to find that the *Madison Company* was the holder of the bonds; that it had advanced money

thereon to the maker, which was to be reimbursed out of the money arising from the sale thereof.

In the case of *Stoney* v. *The American Life Insurance Company*, 11 Paige's Ch. Rep. 635, it was held by Chancellor WALWORTH, that "the negotiable security of a corporation, which upon its face appears to have been duly issued by such corporation, and in conformity with the provisions of its charter, is valid in the hands of a *bona fide* holder thereof without notice, although such security was, in fact, *issued for a purpose, and at a place, not authorized by the charter* of the company, and in violation of the laws of the state where it was actually issued." In the case of *The Farmers' and Mechanics' Bank* v. *The Butchers and Drovers' Bank*, 16 New York Rep. 125, SELDEN, J., after citing this and two other cases, says: "I have no hesitation in concurring with these learned judges in the principle thus asserted, and am not aware that a contrary opinion has ever been judicially expressed. A citizen who deals directly with a corporation, or who takes its negotiable paper, is presumed to know the extent of its corporate power. But when the paper is, upon its face, in all respects such as the corporation has authority to issue, and its only defect consists in some extrinsic fact, such as the purpose or object for which it was issued, to hold that the person taking the paper must inquire as to such extraneous fact, of the existence of which he is in no way apprized, would obviously conflict with the whole policy of the law in regard to negotiable paper."

In the case of *Smead et al.* v. *The Indianapolis, Pittsburgh & Cleveland Railroad Company*, 11 Ind. 104, this court attempted to draw a distinction between paper executed beyond the power, and that executed within the power of the corporation, but by an abuse of the power in that particular instance. After a careful review of all authorities on the question, it is difficult to sustain such a distinction on any sound principle of law or reason, when applied to commercial paper, legal on its face, and when the

lack of power must be sought in extrinsic facts. It is clear, where the paper, on its face, shows the want of power, that it will be void in the hands of the assignee, for there cannot be an innocent holder of such paper.

The general principle, we think, fairly deducible from the authorities, is this; the general agent of a corporation, clothed with a certain power by the charter, or the lawful act of the corporation, may use that power for an unauthorized, or even a prohibited, purpose, in his dealings with an innocent third party, and yet render the corporation liable for his acts.

The judgment is affirmed, with 1 per cent. damages, and costs.

A petition for a rehearing having been filed, the following opinion, overruling the petition, was delivered by

FRAZER, J.—In an earnest petition for a rehearing, the appellant insists that the bonds bore evidence upon their face that they were being sold for the benefit of the *Martinsville Company*, and that the *Madison Company* had no interest in them, and was therefore a mere accommodation indorser and guarantor, and that this fact, patent upon the bonds, was notice to every holder. The matter which it is urged was sufficient to give this notice, consists of a certificate by the trustee, *Mr. Lanier*, and an order of the board of directors of the *Martinsville Company*, printed on the face of each bond, to-wit:

### CERTIFICATE.

" I, *James F. D. Lanier*, trustee, do hereby certify that the *Martinsville & Franklin Railroad Company* have conveyed to me, by deed bearing date the 28th day of *April*, 1851, their road from *Martinsville* to *Franklin*, about twenty-five miles, with its income and franchises, and all the property, rights and privileges of the company pertaining thereto, in trust for the use and benefit of the holders of their obligations,

The Madison and Indianapolis R. R. Co. *v*. The Norwich Saving Society.

issued and to be issued; that is to say, the sum of $30,000 dollars on the 1st day of *May*, 1851, and not exceeding the sum of $50,000, and only so much thereof as may be requisite to be issued, from time to time, after the 1st day of *May*, 1851, as the same may be necessary to make payment for iron purchased for said road. The first class of said bonds to be redeemable *May* 1st, 1861, and the latter class redeemable *November* 1st, 1863, as by reference to said deed of trust, which I have caused to be recorded in the several counties in, or through, which said railroad is located, will more fully and at large appear. I further certify that this bond is one of the obligations issued under said deed.　　　　　　　　　　J. F. D. LANIER, *Trustee.*
*New York, May* 1st, 1851."

### ORDER.

"At a regular meeting of the Board of Directors of the *Martinsville & Franklin Railroad Company*, in the town of *Martinsville*, county of *Morgan*, state of *Indiana*, on *Monday*, the 7th day of *April*, 1851, it was ordered by the board: That the president of the board be, and he is hereby, authorized to effect a loan, or otherwise raise a sufficient sum of money, say $35,000, to defray the expenses of putting the superstructure on this road, by the sale of the bonds of this company, the principal of the bonds to be made payable in ten years from date, drawing interest at the rate of seven per cent. per annum; and that he be authorized to purchase or procure the iron necessary for the road, on the best possible terms; also, that he be empowered to execute, or cause to be executed, a mortgage on the road, to secure the payment of the price of the iron aforesaid, and the principal and interest of the said bonds; and that he fix the time of paying the principal of the price of the iron at twelve years, and the rate of interest on the price of the same at a rate not to exceed seven per cent. per annum."

We cannot perceive how all this can fairly be held sufficient to impart to the holder of the bonds notice that the *Madison Company* was but an accommodation guarantor. What does appear by the face of the bonds, taken altogether? 1. That the directors of the *Martinsville Company* authorized the issue of bonds, not exceeding $35,000, to obtain money to put the superstructure on its road; such bonds to be payable in ten years from date. 2. That these bonds were issued under that authority. 3. That they were payable to the *Madison Company*, or assigns. 4. That the latter company, a year afterward, indorsed them, and guaranteed their payment. Then it otherwise appears that the latter company afterward pretended to own them; had them in its possession; put them on the market, sold them, and received the proceeds. Thus they were put in circulation with not a circumstance appearing on their face, or extrinsically, suggestive of a doubt that the *Madison Company* owned the bonds and was selling them on its own account. We find it difficult to imagine any course of conduct possible to have been pursued, which would have been likely to be more effectual in creating a belief among capitalists that the bonds were owned by that company. By assigning them, the company covenanted that they were its property. It is not graceful to deny this now, after parties have been induced to part with their money in consequence of their reliance upon this fact.

If the bonds had been payable to bearer, then the guaranty would have implied little or nothing as to the fact of ownership by the appellant, and would have had little tendency to mislead as to a fact upon the existence of which the power to make the guaranty depended, and, in that case, the question would have been a different one. Every person taking the bonds in suit was bound, it is true, to take notice of the limits of the power of the corporation which had guaranteed the paper. But whether the bonds in question had been received by the company in the course of its lawful business, or whether the company had no ownership

or interest in them, was a question of fact, and not of law. To hold that, in this case, the purchaser of the bonds, possessing as they do the attributes of commercial paper, must, at his peril, ascertain these extrinsic facts, would be so utterly at variance with the well settled and just principles of law relating to such paper, and would, if made a precedent, be fraught with such incalculable mischiefs to public and private interests, that we are not disposed to take the step. It is not entirely certain that its evil consequences would not be quite as adverse to the interests of railroad corporations, as to those of the community at large.

The petition for a rehearing is overruled.

*T. A. Hendricks* and *O. B. Hord*, for appellant.

*J. S. Newman, H. C. Newcomb* and *J. S. Tarkington*, for appellee.